UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

UNITED STATES OF AMERICA,

    Plaintiff,

v.

                                          Case No. 1:22-cr-34

REDO LAMONT ROLLING,                      Hon. Hala Y. Jarbou

    Defendant.
_____/

## OPINION

The Government has charged Defendant Redo Lamont Rolling with three credit union robberies occurring in November 2021. He asks the Court to suppress evidence stemming from search warrants executed by the Government. (*See* Def.'s Mot. to Suppress, ECF No. 35.) The Court will deny his motion.

### I. BACKGROUND

#### A. Charges

Counts 1 and 2 of the Indictment charge Rolling's Co-Defendant, Tommy Maurice-Sans Jurl, with two cash store robberies, one on June 23, 2020, and another on July 16, 2020. Counts 3 to 5 of the Indictment charge Rolling and Jurl with three credit union robberies, one on November 18, another on November 24, and another on November 30, 2021.

#### B. Warrants

##### 1. Warrant for GPS Tracker on Rolling's Vehicle

On November 30, 2021, a magistrate judge issued a warrant for a GPS tracking device to be placed on Rolling's 2002 silver Ford Taurus. The warrant identifies this vehicle by year, make, model, license plate number, VIN, and owner. (GPS Warrant, ECF No. 35-1, PageID.71.) To support a finding of probable cause, the warrant affidavit describes the circumstances of the three

credit union robberies in November 2021 and the vehicle's apparent connection to each of those robberies.

The affidavit states that on November 18, 2021, at 10:55 am, two deputies were dispatched to a credit union in Byron Center, Michigan, in response to a robbery. A teller working the counter told police that a "black male" wearing all black and a blue surgical mask had given her an envelope with a note demanding $50,000. (GPS Warrant Aff., ECF No. 35-1, PageID.68.) He told her that it was "for the mafia." (*Id.*) He had a "deep raspy voice." (*Id.*, PageID.69.) The teller and another employee gave him money in a black plastic bag. He was last seen running southeast of that location.

There were no exterior cameras at the credit union. The police attempted to track the suspect with a canine, but they were unsuccessful. They canvassed the area and spoke with an employee at a dentist's office located "several businesses to the east" of the credit union. (*Id.*) She said that she had seen a "suspicious silver Ford Taurus with two black males parked behind the building" a few minutes before the robbery. (*Id.*) The vehicle was "beat up."

On November 24, 2021, police responded to a reported robbery at a credit union in Wyoming, Michigan. The police learned that a black male wearing black clothes, a black "dew rag," and a blue surgical mask had given the teller an envelope and demanded $50,000. (*Id.*) The teller gave him money and he fled. He was seen entering a silver Ford Taurus.

The police ran photo and video footage of the incident through image recognition software and discovered a "possible hit" on Jurl. (*Id.*) They then discovered images and video of him on social media wearing a black "dew rag" and speaking in a low, deep voice. (*Id.*) They learned that he was a suspect in a cash store robbery in Muskegon, Michigan, on December 28, 2020, in which the suspect stated that the "mafia was going to kill his family[.]" (*Id.*)

A deputy recalled another incident involving a suspect referring to the mafia before demanding money from a cash store. That incident occurred on July 16, 2020, in Kent County, Michigan. Video and audio from the incident showed a suspect with a "similar appearance" to Jurl, speaking in a "low raspy voice." (*Id.*, PageID.70.) The suspect stated that there were "six mafia members" waiting outside the store. (*Id.*) A witness from this incident recalled a "dirty grey" Ford Taurus or Mercury Sable driving around the building for five minutes, which the witness thought was suspicious. (*Id.*)

From video of the incident in Wyoming, police were able to identify 5261 as the last four digits of the license plate on the silver Ford Taurus. A license plate search turned up a silver Ford Taurus with a license plate of DZL5261, registered to Rolling.

On November 30, 2021, police responded to another credit union robbery in Grand Haven, Michigan. Video of the incident showed a black male enter the building and demand money. The video also showed a silver Ford Taurus parked across the street.

Finally, the affidavit states that police distributed the vehicle information to other agencies. A detective in Norton Shores identified the vehicle from local retail frauds involving Rolling. He produced a picture of the vehicle. It had a white sticker near the top of the right-hand corner of the back windshield and a license plate of DZL5261. Those characteristics matched those seen in the video from the Wyoming incident.

Based on the foregoing, the judge approved the warrant. The next day, December 1, 2021, the police placed a GPS tracker on Rolling's vehicle at his home at 760 Catherine Avenue in Muskegon, Michigan.

### 2. Warrant to Search Rolling's Home

On December 2, 2021, a magistrate judge signed a warrant to search Rolling's home. The warrant describes the home itself and identifies its address. (Home Warrant, ECF No. 35-2.) It

3

directs police to seize evidence related to the two credit union robberies in November 2021 and a cash store robbery on December 2, 2021, including evidence on electronic devices. (*Id.*, PageID.74.)

A large portion of the affidavit supporting this warrant request recites details that were contained in the affidavit for the GPS tracker. It includes the details about the robberies on November 18, November 24, and November 30, 2021, as well as Jurl's suspected involvement in the cash store robbery on July 16, 2021.

The warrant affidavit also mentions that the police placed a GPS tracker on Rolling's vehicle on December 1, 2021, at 760 Catherine Avenue. (Home Warrant Aff., ECF No. 35-2, PageID.78.) It states that this address "belongs to Redo Rolling." (*Id.*) And it describes how that GPS tracker showed that Rolling's vehicle was tied to an attempted cash store robbery occurring in Muskegon on the morning of December 2, 2021. According to the affidavit, Rolling's vehicle left his house in Muskegon at 8:54 am. (*Id.*) It made several stops before arriving at Avon Avenue, "just north of 28th [Street]," at 10:33 am. (*Id.*) It started moving again at 10:47 am. At 10:47 am, a cash store on 28th Street reported an attempted robbery. A store employee said that the suspect, a black male, fled on foot on a side street and then turned north on Avon Avenue. The store employee also reported that the suspect told her that he had "3 friends waiting outside with guns" and demanded that she fill a black plastic bag with money. (*Id.*, PageID.79.) She refused his demands and pressed a panic button, causing the suspect to flee.

Finally, the affiant states that the police stopped the vehicle in Grand Rapids. Rolling was driving and Jurl was the passenger. Jurl was holding a black plastic bag and was wearing clothing that matched the clothing of the suspect in video footage from the cash store. In Rolling's wallet,

police discovered dollar bills with serial numbers that matched some of the money stolen from credit unions on November 24 and November 30, 2021. The police arrested both Rolling and Jurl.

Based on the foregoing, the judge approved the warrant. The police executed this warrant that same day it was approved but did not find any stolen money at Rolling's home.

### 3. Amended Warrant to Search Rolling's Home

Later in the day on December 2, 2021, the magistrate judge issued an amended warrant to search Rolling's home. The amended version of the warrant allowed police to search vehicles parked in the driveway of the home as well as any detached garages or sheds on the property. (Am. Home Warrant, ECF No. 35-3, PageID.81.)

The warrant affidavit for the amended warrant to search the home repeats the details in the other affidavits discussed above. It also mentions that the police did not find stolen money at Rolling's home. Consequently, they began listening to calls that he made from the Kent County Jail. (Am. Home Warrant Aff., ECF No. 35-3, PageID.83.) That afternoon, they had heard Rolling call a number and ask to speak with a particular woman, stating that he wanted "to tell her where the money is at in the house so she can bond him out." (*Id.*, PageID.87.) About an hour later, he called the number again and reached the woman; she told him that the police were at his home and she could not get inside. He told her to "go in and 'get the money.'" (*Id.*) About 20 minutes later, he called her again and she told him that "CPS is going to get called because of all the 'stuff on the counter.'" (*Id.*) They discussed the "items on the counter with concerns" and she stated, "they messed up, it's over." (*Id.*) In a whisper, he told her, "[T]here's like 17 in the stakes." She replied, "That's gonna be gone." (*Id.*)

Based on the content of these calls, the police believed that the stolen money was still located in Rolling's home.

5

#### 4. Smartphone Warrant

On December 8, 2021, a judge of the district court in Wyoming, Michigan, issued a warrant to search a silver LG smartphone with a black case that was in the possession of the Wyoming Police Department. (Smartphone Warrant, ECF No. 35-4, PageID.90.)[1] The police had seized this phone from Rolling when they arrested him.

To support probable cause, the warrant affidavit describes the circumstances of the November 24, 2021 credit union robbery in Wyoming, Michigan. It explains that an employee at the credit union reported that a "black male wearing all black" came to the teller window and demanded that she turn over the cash in her drawer. (Smartphone Warrant Aff., ECF No. 35-4, PageID.93.) She filled his black plastic bags with cash, including several packs of "bait bills." (*Id.*) The suspect then fled the building to the northeast. Security footage to the east of the building from several minutes earlier showed the same person "get out of a silver early 2000s model Ford Taurus and walk to the bank with a folder in his hand." (*Id.*) A short time later, he returned and climbed into the passenger side of the vehicle, which then left the scene. From the video, police were able to identify the last four numbers of the license plate on the vehicle and then a plate search yielded a suspect vehicle owned by Rollings.

The affidavit states that the police arrested Rollings after an investigation. At his arrest, police discovered bait bills in his wallet that originated from several credit union robberies. Police also discovered the silver LG smartphone on the floorboard of the driver's seat of his vehicle. According to the affiant's "experience and training," "cell phone records greatly assist in investigations by showing exact time suspects use the phones before, during and after commission

---

[1] The warrant is dated September 8, 2020, but this was likely a clerical error. The subject of the warrant matches the subject in the warrant affidavit dated December 8, 2021. (Smartphone Warrant Aff., ECF No. 35-4, PageID.92.) Also, the judge's signature on the warrant matches the signature of the judge on the warrant affidavit. (*See id.*, PageID.94.)

6

of crimes." (*Id.*) Also, "[c]ell phone contents and data often assist in providing valuable evidence showing where the phone was during the time the crime was committed." (*Id.*)

### 5. DNA Warrant

On December 8, 2021, a court also issued a search warrant to obtain a buccal swab or blood sample from Rolling for the purpose of DNA testing. (DNA Warrant, ECF No. 35-5.) The warrant affidavit refers to the credit union robbery on November 24, 2021, in which the suspect was a black male wearing all black and was last seen walking northeast of the credit union. Security footage from the east of the building showed the same individual exiting a silver "early 2000s model" Ford Taurus and walking toward the credit union with a folder in hand. (*Id.*, PageID.97.) A short time later, he returned to the Ford Taurus and then left the scene. Police recovered a cigarette butt from the area where the vehicle had been. The police wanted to compare possible DNA evidence recovered from that cigarette butt to Rolling's DNA.

### 6. Cell Site Location Data Warrant

On December 22, 2021, the police obtained a warrant to retrieve cell site location data from T-Mobile. (*See* T-Mobile Search Warrant, ECF No. 61-2.) That warrant identifies a cell phone number belonging to Rolling and allows the seizure of the "latitude/longitude GPS coordinates and cellular phone tower locations the [cell phone] used between [specified] dates," as well as "cell towers used during data or voice communications" for those dates. (*Id.*, PageID.298.)

To support the warrant request, an officer submitted an affidavit referring to the November 30, 2021, credit union robbery in Grand Haven and the presence of a silver Ford Taurus in surveillance footage from that robbery. The affidavit also references the Wyoming robbery occurring on November 24, 2021, and the fact that the Wyoming police department had "developed a similar suspect vehicle" from that incident and obtained a search warrant to place a GPS tracker on Rolling's vehicle. (T-Mobile Search Warrant Aff., ECF No. 61-2, PageID.296.)

Finally, the affidavit indicates that Rolling's vehicle was in the vicinity of a cash store robbery on December 2, 2021, and that the police arrested Rolling and Jurl in the vehicle. At the time of their arrest, they had cell phones in their possession. The affiant believed that "search of the boost cell phone account for [Rolling's] number will result in further evidence for the bank robbery investigation as it will show the location of the cell phone during [the] robbery investigation." (*Id.*, PageID.297.)

## II. LAW

The Fourth Amendment protects individuals from "unreasonable searches and seizures." U.S. Const. amend. IV. It also provides that a warrant must have probable cause "supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized." *Id.* "Probable cause 'is not a high bar.'" *Dist. of Columbia v. Wesby*, 138 S. Ct. 577, 586 (2018) (quoting *Kaley v. United States*, 571 U.S. 320, 338 (2014)). It "requires only a probability or substantial chance of criminal activity, not an actual showing of such activity[.]" *Id.* (quoting *Illinois v. Gates*, 462 U.S. 213, 243-44 n.13 (1983)). It exists where the "facts and circumstances" are "sufficient to warrant a prudent person . . . in believing . . . that the suspect has committed, is committing, or is about to commit an offense." *Michigan v. DeFillippo*, 443 U.S. 31, 37 (1979). It is a "practical and common-sensical standard" based on "the totality of the circumstances." *Florida v. Harris*, 568 U.S. 237, 244 (2013).

Thus, to obtain a proper search warrant, the officer "must submit an affidavit that 'indicate[s] a fair probability that evidence of a crime will be located on the premises of the proposed search.'" *United States v. Hines*, 885 F.3d 919, 923 (6th Cir. 2018) (quoting *United States v. Dyer*, 580 F.3d 386, 390 (6th Cir. 2009)). The warrant affidavit must also establish a "nexus between the place to be searched and the evidence sought." *United States v. Carpenter*,

360 F.3d 591, 594 (6th Cir. 2004) (en banc) (quoting *United States v. Van Shutters*, 163 F.3d 331, 336-37 (6th Cir. 1998)).

The Court examines the "four corners" of the affidavit "under the totality of the circumstances . . . with 'great deference toward' the determination of the judge who issued the search warrant." *United States v. Helton*, 35 F.4th 511, 518 (6th Cir. 2022) (quoting *United States v. Jackson*, 470 F.3d 299, 306 (6th Cir. 2006)). "When an affidavit relies on information from a confidential source or an anonymous tipster, examining the totality of the circumstances includes examining the 'veracity, reliability, and basis of knowledge' of the source." *Id.* (quoting *Hines*, 885 F.3d at 923).

### III. ANALYSIS

#### A. Warrants

##### 1. GPS Warrant

Rolling notes that attaching a GPS tracking device to a vehicle is a search that requires a warrant supported by probable cause. *See United States v. Jones*, 565 U.S. 400, 404 (2012). He contends that the GPS warrant affidavit in his case was invalid because it "identified no facts relating to Defendant Rolling in particular." (Def.'s Br., ECF No. 36, PageID.105.) It did not have to do so, however, because the warrant was directed at the vehicle itself. Search warrants are directed at places, not people. *See Zurcher v. Stanford Daily*, 436 U.S. 547, 555 (1978) ("Search warrants are not directed at persons; they authorize the search of 'place[s]' and the seizure of 'things,' and as a constitutional matter they need not even name the person from whom the things will be seized.").

Here, the warrant affidavit gave ample grounds for believing that Rolling's vehicle was involved in a series of similar robberies in West Michigan. Witnesses saw a silver Ford Taurus in close proximity to several such robberies. Some witnesses saw the suspect of a robbery using that

9

sort of vehicle to leave immediately after the robbery. Also, video from the Wyoming robbery captured part of the license plate of what appeared to be the same vehicle, allowing police to hone in on the vehicle owned by Rolling. These facts were sufficient to establish probable cause that Rolling's vehicle was tied to ongoing criminal activity, and that monitoring could uncover additional evidence of such activity.

Rolling apparently contends that the description of his car "did not come from any witness whose credibility or reliability at the scene was established." (Def.'s Br., PageID.105.) But he provides no case law suggesting that the witness statements and video evidence in this case were insufficient. The witnesses here were not confidential informants or anonymous sources. They were eyewitnesses identified by name and location in the warrant affidavit. Looking at the totality of the circumstances, their accounts were sufficiently reliable to provide support for probable cause.

### 2. Cell Site Location Warrant

Rolling argues that the warrants did not give the police authorization to search for cell site location data related to his cell phone, so they exceeded the scope of the warrants when obtaining that data. As indicated above, however, the police obtained a separate search warrant to retrieve cell site location data from T-Mobile.

### 3. Warrants to Search Rolling's Home and Cell Phone

Rolling compares the warrants in this case to the one in *United States v. Davis*, 970 F.3d 650 (6th Cir. 2020), which allowed the police to search his home and seize his cell phone. *Id.* at 653. The affidavit provided facts purporting to show that Davis sold heroin from his home and used his cell phone to do so, but the affidavit did not provide facts establishing that Davis resided at the home identified in the search warrant. *Id.* at 664. "[I]t included no facts connecting Davis to this home." *Id.* at 665. The Government acknowledged that the affidavit was deficient, but it

asserted that the officer provided the necessary facts to the judge issuing the warrant through oral testimony. *Id.* at 666. The district court accepted this assertion, but the Court of Appeals remanded the matter to the district court for an evidentiary hearing because the Government's assertion in its brief was not evidence. *Id.*

The warrant affidavits here are not deficient like the one in *Davis*. They provide a connection between the robberies and Rolling's home. Among other things, they indicate that a vehicle registered to Rolling was parked at his home on the morning of December 2, 2021, and was used to rob a cash store a few hours later. That same vehicle had been identified in other robberies. And when police stopped this vehicle shortly after the robbery on December 2, Rolling was driving it and was in possession of the cell phone and some of the stolen money. This evidence establishes a sufficient nexus between Rolling's home and cell phone and the probability that evidence from the robberies would be found at his home and on his cell phone. "A magistrate may infer a nexus between a suspect and his residence, depending upon 'the type of crime being investigated, the nature of things to be seized, the extent of an opportunity to conceal the evidence elsewhere and the normal inferences that may be drawn as to likely hiding places.'" *United States v. Williams*, 544 F.3d 683, 687 (6th Cir. 2008) (quoting *United States v. Savoca,* 761 F.2d 292, 298 (6th Cir.1985)). It is reasonable to infer that a bank robber would keep stolen money at his residence. *United States v. Jackson*, 756 F.2d 703, 705 (9th Cir. 1985) (cited in *Williams*, 544 F.3d at 687); *see also Davis*, 970 F.3d at 666 (acknowledging that evidence that the defendant, a suspected drug dealer, lived at a particular location and parked his car there would have been sufficient to establish the required nexus to that location). It is also reasonable to infer that a cell phone possessed during a robbery conducted with the aid of another individual will contain evidence related to that offense.

11

Rolling also compares this case to *United States v. Carpenter*, 360 F.3d 591 (6th Cir. 2004), in which the warrant affidavit stated only that marijuana was seen growing "'near' the residence" to be searched and that "a road ran nearby[.]" *Id.* at 594. Those facts were not sufficient to support probable cause to believe that there would be evidence of marijuana manufacturing or distribution at the residence. *Id.* Those are not the facts here. The affidavits here tied the resident of the home and a vehicle parked at the home to the robberies, giving police sufficient cause to obtain a warrant to search the home. The affidavits also tied the cell phone to Rolling and his involvement in at least one robbery, giving police sufficient cause to obtain a warrant to search the phone.

Rolling cites *United States v. Brown*, 828 F.3d 375 (6th Cir. 2016), in which the Court of Appeals held that a warrant affidavit failed to "include facts that directly connect the [defendant's] residence with the suspected drug dealing activity[.]" *Id.* at 384. According to that court, "[i]t cannot be inferred that drugs will be found in the defendant's home—even if the defendant is a known drug dealer." *Id.*

*Brown* does not necessarily apply here because the likelihood that evidence of drug dealing will be found at the drug dealer's home is a "fact-intensive" inquiry. *Id.* Indeed, there are cases that "point in both directions" on this issue. *United States v. Sheckles*, 996 F.3d 330, 341 (6th Cir. 2021). In contrast to *Brown*, some cases "have repeatedly noted that '[i]n the case of drug dealers, evidence is likely to be found where the dealers live.'" *Id.* (quoting *United States v. Sumlin*, 956 F.3d 879, 886 (6th Cir. 2020)). This apparent conflict in the case law can be reconciled "in fact-specific ways." *Id.* at 342. In *Brown*, for instance, the evidence was not sufficient to establish that the defendant was, in fact, a "known drug dealer." *See Brown*, 828 F.3d at 385. But here, unlike *Brown*, there was sufficient evidence that Rolling was involved in several robberies. Also, he parked the car used in the robberies at his home. Based on these facts, a magistrate judge could

12

infer a fair probability of finding evidence of the robberies at his home. And the amended warrant affidavit, which discussed Rolling's statements about money located at his house, provided a sufficient basis to search his home again after the first search failed to uncover evidence.

### 4. DNA Warrant

The Government does not intend to introduce evidence obtained through the DNA warrant, so suppression of DNA evidence is not necessary. (Gov't's Resp. Br., ECF No. 61, PageID.280.) And in any case, the warrant affidavit provides a sufficient basis for probable cause.

### B. Good Faith Exception

Even if the facts supporting the foregoing warrants were not sufficient, suppression of the evidence obtained from those warrants would be barred by the good faith exception in *United States v. Leon*, 468 U.S. 897 (1984). There, the Supreme Court held that evidence "'obtained in objectively reasonable reliance' on [a] 'subsequently invalidated search warrant' . . . should not be suppressed." *Helton*, 35 F.4th at 521 (quoting *Leon*, 468 U.S. at 922). The court in *Leon* "identified four circumstances where an officer's reliance would not be objectively reasonable:"

> (1) the magistrate was "misled by information in the affidavit that the affiant knew was false or would have known was false except for his reckless disregard of the truth;" (2) the magistrate "abandoned his judicial role" or neutrality; (3) the warrant was "so lacking in indicia of probable cause" as to render official belief in its existence unreasonable; or (4) the warrant was so "facially deficient" that it could not reasonably be presumed valid.

*Id.* (quoting *United States v. McClain*, 444 F.3d 556, 564-65 (6th Cir. 2005)).

Rolling argues that the warrant affidavits in this case "provided an insufficient basis" to find probable cause and "lacked so significantly in probable cause as to render official belief in its existence entirely unreasonable." (Def.'s Br., PageID.114.) The Court disagrees. The affidavits were sufficient to find probable cause. And to the extent there is any lingering doubt about the initial warrant to search Rolling's home because cases point in different directions regarding

13

evidence of criminal activity at the homes of drug dealers, the Court cannot say that no reasonable officer would have relied upon that search warrant. Likewise, the Court cannot say that no reasonable officer would have relied on the other warrants. Thus, the *Leon* exception applies even if the warrants were invalid.

## IV. CONCLUSION

For all the foregoing reasons, the Court will deny Defendant's motion to suppress.

An order will enter that is consistent with this Opinion.

Dated: August 15, 2022 /s/ Hala Y. Jarbou
HALA Y. JARBOU
CHIEF UNITED STATES DISTRICT JUDGE